UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


NEIL LENWOOD FERRELL

      Applicant,

v.                                                          CASE NO. 8:12-cv-194-T-23AEP

SECRETARY, Department of Corrections,

      Respondent.
_____/


## O R D E R

      Neil Lenwood Ferrell applies for the writ of habeas corpus under 28 U.S.C.

§ 2254 (Doc. 1) and challenges the validity of his state conviction for aggravated

battery with a deadly weapon.  Ferrell alleges two grounds of trial court error and

twenty-four grounds of ineffective assistance of trial counsel.[1]  Numerous exhibits

("Respondent's Exhibit __") support the response.  (Doc. 13)

## FACTS[2]

      Suzette Maldanado's car broke down.  Robert Beck (the "victim") offered

assistance.  Ferrell approached the victim while he was helping Maldanado and

---

   [1] As explained later in this order, both grounds of trial court error and seventeen of the grounds of ineffective assistance of counsel are procedurally barred from federal review. This order addresses the merits of only grounds four, five, seven, eight, nine, eleven, and twelve.

   [2] This factual summary derives from Ferrell's brief on direct appeal and the record. (Respondent's Exhibits 1, 2, 6)

began staring at the victim without speaking.  The victim inquired if he could help

Ferrell, who said nothing but continued to stare.  When the victim again asked

Ferrell if he could help him, Ferrell responded "there's a problem," pulled out a

metal pipe, and attacked the victim.  The victim tried to subdue Ferrell until the

police arrived.  During the ensuing scuffle Ferrell escaped the victim's grasp by

spraying the victim in the face with pepper spray.  Ferrell, wearing an orange safety

vest, got on a white bicycle and fled.  The victim suffered serious cuts to his head and

ear.  The police arrived and recovered the metal pipe.  Both Maldanado and the

victim described the suspect to Office Roy Paz.  The police could not locate Ferrell.

One week after the attack the victim saw Ferrell on the street wearing an

orange safety vest and riding a white bicycle.  The victim flagged down a passing

police officer and reported that Ferrell was his attacker.  Officer David Torres

approached Ferrell and arrested him.  Maldanado later identified Ferrell in a

photographic line-up.[3]  An information charges Ferrell with aggravated battery

with a deadly weapon.  A jury convicted Ferrell after he unsuccessfully pursued a

misidentification defense at trial.  He serves thirty years imprisonment as a habitual

felony offender.

---

[3]  The crime occurred in February 1996. When Ferrell's trial began over three years later in
March 1999, both the metal pipe and the original photopack had been lost.

## I.    EXHAUSTION AND PROCEDURAL BAR

In his Rule 3.850 motion Ferrell presented thirty grounds for relief. (Respondent's Exhibit 6, Vols. IV, V)  The state post-conviction court summarily denied fourteen of the grounds and granted Ferrell an evidentiary hearing on sixteen of the grounds.  The state post-conviction court ultimately denied those sixteen grounds after the evidentiary hearing.  (Respondent's Exhibit 6, Vols. I, II)  Ferrell appealed the denial of seven of the thirty grounds — one of the summarily denied grounds and six of the grounds rejected after the evidentiary hearing.  Ferrell asserts in the federal application the seven grounds he raised in the state post-conviction appeal and nineteen of the other grounds that he raised in the Rule 3.850 motion but did not appeal.  The respondent correctly argues that the nineteen grounds that Ferrell did not appeal in the state court are unexhausted and procedurally defaulted, precluding federal review.[4]

---

[4]   In his reply (Doc. 20, pp. 1–3) Ferrell argues that the nineteen grounds are not procedurally barred because he tried to present the grounds to the state post-conviction court in his *pro se* pleadings after his post-conviction appellate counsel filed an appellate brief omitting the grounds. To argue exhaustion Ferrell relies on the unpublished decision in *Hitchcock v. Sec'y, Dep't of Corr.*, 360 Fed. App'x 82 (11th Cir. 2010), in which the state post-conviction court denied Hitchcock's Rule 3.850 motion after an evidentiary hearing. Hitchcock appealed. Before the state responded, Hitchcock moved *pro se* for leave to supplement the brief because "his counsel did not provide him with a copy of the brief; his counsel's brief failed to raise several of the claims raised in the 3.850 motion; he had demanded by letter that his counsel file a supplemental brief asserting all claims raised and ruled upon in the Rule 3.850 motion; and counsel had refused to do so." 360 Fed. App'x at 82. The state appellate court denied the motion to supplement. Hitchcock next filed a federal habeas application in which he raised all of the Rule 3.850 claims denied by the state court, including those claims that counsel refused to appeal and which the state appellate court refused to allow him to supplement. The federal district court found unexhausted the Rule 3.850 claims that counsel refused to raise in the appellate brief, a decision *Hitchcock* reversed based on the following reasoning, 360 Fed. App'x at 85–88:

(continued...)

Before a federal court can grant habeas relief, a federal habeas applicant must

exhaust every available state court remedy for challenging his conviction, either on

direct appeal or in a state post-conviction motion.  28 U.S.C. § 2254(b)(1)(A), (C).

---

[4](...continued)

First, at the time Hitchcock filed his Supplemental Motion, there was
no Florida Rule of Appellate Procedure, no published internal
operating procedure in the First DCA, and no published district court
of appeals opinion forbidding a *pro se* brief in Hitchcock's
circumstances. The Florida Supreme Court had not promulgated a
Florida Rule of Appellate Procedure prohibiting or otherwise
addressing the Florida intermediate appellate courts' consideration of
*pro se* briefs filed on direct or collateral appeal by persons represented
by counsel. Nor had any of the Florida district courts of appeal
included such a rule within their published Internal Operating
Procedures. Nor was there a single published opinion by a Florida
district court dating prior to March 2004 (when Hitchcock filed his
motion in the state court) in which a Florida district court denied a
motion for leave to file a *pro se* brief filed by an appellant with counsel
in a post-conviction appeal.

. . . .

No DCA had a rule prohibiting *pro se* briefs by counseled appellants
at the time Hitchcock filed his motion. The First DCA did not cite
binding authority for its rejection of his motion. In light of the failure
of the Florida courts of appeals to have a firmly established and
regularly applied rule prohibiting such briefs at the time Hitchcock
filed his supplemental motion, we hold that the Florida judgment
dismissing the 3.850 claims does not rest on an adequate state rule of
decision and that, therefore, Hitchcock's federal claims are not barred
from our review.

Although Ferrell in his Rule 3.850 appeal took an approach procedurally similar to *Hitchcock*,
his case is distinguishable. After the appointment of post-conviction appellate counsel, Ferrell sent
counsel a letter requesting that she appeal all thirty grounds denied in the Rule 3.850 motion. He
also sent counsel a *pro se* appellate brief raising twenty-eight of the denied claims and requested that
counsel incorporate, or supplement her brief with, his *pro se* brief. Counsel's appellate brief includes
only seven of the thirty grounds. Ferrell moved in the state court for leave to file his *pro se* appellate
brief because counsel failed to raise the claims in her brief.  The state appellate court struck Ferrell's
*pro se* brief without prejudice and gave him the opportunity to move to discharge appellate counsel
and proceed *pro se*. Ferrell admits in the reply (Doc. 20, p. 3) that, unlike *Hitchcock*, he "proceeded
with appellate counsel's initial brief and his appeal was denied . . . ." Ferrell's failure to present all
of his grounds to the state appellate court results in a procedural default.

"[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted)). To exhaust a claim, an applicant must present the state court with the particular legal basis for relief in addition to the facts supporting the claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement that an applicant exhaust each available state court remedy as a prerequisite to federal review is satisfied if the applicant "fairly presents" his claim in each appropriate state court, alerting that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). Ferrell, through counsel, filed in March, 2011 his appellate brief challenging the denial of his Rule 3.850 motion. The Florida Second District Court of Appeal subsequently issued *Cunningham v. State*, 131 So. 3d 793 (Fla. 2d DCA 2012), which explains

that between December 2000 and September 2010 the policy for an appeal of the

denial of a Rule 3.850 motion required briefing only for a ground that was denied

after an evidentiary hearing but included a merits review of a summarily denied

ground even if the ground was not briefed on appeal.  Because he filed his appellate

brief after September 2010, Ferrell was required to raise in the brief both the grounds

summarily denied by the state post-conviction court and the grounds denied after

the evidentiary hearing to obtain review of all of the grounds.  Ferrell's failure

to brief on collateral appeal some of the grounds denied in the Rule 3.850

motion — presented in the federal application as grounds one, two, three, six,

ten, and thirteen through twenty-six — results in abandonment.  Fla. R. App. P.

9.141(b)(3)(C).  *See also Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)[5]

(stating that exhaustion of a claim raised in a Rule 3.850 motion includes an appeal

from the denial of the motion); *Cunningham*, 131 So. 3d at 794 (explaining that an

appeal of the denial of a Rule 3.850 motion requires briefing for a ground denied

after an evidentiary hearing).  Consequently, grounds one, two, three, six, ten, and

thirteen through twenty-six of the federal application are each unexhausted and

procedurally defaulted because Ferrell cannot return to state court to file a timely

collateral appeal.  Fla. R. Crim. P. 3.850(k).

---

[5] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

"If the [applicant] has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, an applicant "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, an applicant must demonstrate not only that an error at the trial created the possibility of prejudice but that the error worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152 (1982). In other words, an applicant must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

Without showing cause and prejudice, an applicant may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986). A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone who is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892. To meet the "fundamental miscarriage of justice" exception, Ferrell must show constitutional error coupled with "new reliable evidence — whether . . .

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Ferrell fails to demonstrate cause and prejudice excusing the default of each unexhausted ground. *Carrier*, 477 U.S. at 495–96. Ferrell cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Ferrell satisfies neither exception to procedural default, grounds one, two, three, six, ten, and thirteen through twenty-six of the federal application are procedurally barred.

## II.   **MERITS**

Ferrell's remaining grounds of ineffective assistance of trial counsel (grounds four, five, seven, eight, nine, eleven, and twelve) are exhausted and entitled to a review on the merits.[6]

### **STANDARD OF REVIEW**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d), which creates a highly

---

[6] The state post-conviction court's order (Respondent's Exhibit 6, Vols. I, II) denying Ferrell's Rule 3.850 motion is 215 pages in length and includes more than 150 attachments. The order includes a thorough discussion of (1) Ferrell's grounds for relief, (2) the state's response to Ferrell's Rule 3.850 motion, (3) the testimony and arguments presented at both the trial and the evidentiary hearing on Ferrell's Rule 3.850 motion, and (4) legal analysis of Ferrell's grounds. This order addresses the federal application and includes the lengthy excerpts from the state post-conviction court's order necessary for a merits review of the exhausted grounds of ineffective assistance of counsel.

deferential standard for federal court review of a state court adjudication, states in

pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), the Supreme Court

interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 526 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

In a *per curiam* decision without a written opinion the state appellate court affirmed the denial of Ferrell's Rule 3.850 motion to vacate. (Respondent's Exhibit 10)  The state appellate court's *per curiam* affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).  *See also Richter*, 131 S. Ct. at 784–85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

*Pinholster*, 131 S. Ct. at 1398.  Ferrell bears the burden of overcoming by clear and convincing evidence a state court factual determination.  "[A] determination of a

factual issue made by a State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).  This presumption of correctness

applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v.*

*Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).  The state

court's rejection of Ferrell's post-conviction claims warrants deference in this case.

### STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Ferrell claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas [applicant]s can properly prevail on the ground of

ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th

Cir. 1994)).  *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective

assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice.  *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Ferrell must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691–92.  To meet this burden, Ferrell must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Ferrell cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty to raise a frivolous claim).

Under 28 U.S.C. § 2254(d) Ferrell must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sustaining a claim of ineffective assistance

of counsel is very difficult because "[t]he standards created by *Strickland* and

§ 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is

'doubly' so." *Richter*, 526 U.S. at 105. *See also Pinholster*, 131 S. Ct. at 1410 (stating

that an applicant must overcome this "'doubly deferential' standard of *Strickland* and

the AEDPA."), and *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011)

("Double deference is doubly difficult for a[n] [applicant] to overcome, and it will be

a rare case in which an ineffective assistance of counsel claim that was denied on the

merits in state court is found to merit relief in a federal habeas proceeding.").

## A.  Description of the suspect

In grounds four, eight, and nine Ferrell faults his trial counsel for not

impeaching with Officer Roy Paz's deposition testimony either the victim,

eyewitness Suzette Maldanado, or Officer Paz.  Officer Paz discusses in the

deposition the description of the suspect given by both the victim and Maldanado

on the day of the crime (Respondent's Exhibit 6, Vol. III, August 5, 1998 deposition

of Officer Roy G. Paz, pp. 9–11):

> Q:  [D]id [the victim] mention anything else as far as a description?
>
> . . . .
>
> A:  Yeah, right up here. Black male in the [sic] 30s, about five-ten, 190 pounds, black hair, dark skin, eyes unknown, he was medium built, orange safety belt, maroon t-shirt, brown slacks, white tennis shoes, and was riding a white bike. And that's all the description that I got.
>
> . . . .

- 15 -

Q:  Okay. I know it was quite a while ago. Other than [the victim] did you talk to any other witnesses?

A:  Yes, sir, the lady, Ms. Maldanado.

. . . .

Q:  She gave you the same description?

A:  Yes.

Q:  Was she in the presence of [the victim] when he gave you his description of the scene?

A:  No, they were kind of away from each other. Fire rescue and the ambulance w[ere] attending to [the vicitm] and I think I interviewed her away from over there.

Q:  When you wrote down the description were you taking it from her description or from [the victim]'s or both?

A:  When I first put out the BOLO over the radio I got the description, I believe, from her and then the description for the report from [the victim].

**Ground Eight**

The victim testified on direct examination at trial about his description of the

suspect to the police (Respondent's Exhibit 1, Vol. V, pp. 252–53):

Q:  Very good. Now, when you . . . talked to the police officers, did you give them a statement as to what happened?

A:  Yes.

Q:  Did you give a description?

A:  Yes.

Q:  And what do you remember telling the police officers as a description of the person that attacked you?

A:  I told them he had dark hair. He was dark complected. He was a man about in his mid-30s. He was wearing an orange vest. It was sort of like what you'll see men wearing that are

working on the side of the road. He was wearing work clothes, some type of camouflage pants. And that's basically it.

Q:  Do you remember telling the officer that he was a black male?

A:  No.

Q:  Did you ever say black male?

A:  No, no.

Q:  Did you ever have in your mind that the person who attacked you was a black male?

A:  No.

Q:  If that was contained in a police report, would that have been a mistake in your opinion?

A:  Yes.

Q:  You're certain that the person you described was a white or Hispanic male?

A:  Yes.

Q:  With dark skin — or darker skin?

A:  Dark skin and dark hair.

Q:  . . . [On] that day did you get a good look at his face?

A:  Yes.

Ferrell contends that his trial counsel rendered ineffective assistance by not impeaching the victim's trial testimony — that he did not tell the police that the suspect was a "black male" — with Officer Paz's deposition testimony that the victim described the suspect as a "black male" with "dark skin."

The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and motion for rehearing, pp. 104–16) (court's record citations and footnotes omitted):

<u>Allegations</u>

Mr. Ferrell claims that Counsel failed to impeach [the victim]'s contradictory trial testimony that he did not remember telling Officer Paz that the assailant was a "black male" with the "dark skin black male" description [the victim] gave to Officer Paz on the offense date. Officer Paz testified at his deposition, while reading from his Incident Report, that [the victim] and Ms. Maldanado, in separate questioning, told the officer that the assailant was a "dark skin black male." [The vicitm] testified at trial that he "never" told Officer Paz that the assailant was a "black male." Counsel failed to cross-examine [the victim] with Officer Paz's deposition testimony so that the jury knew that [the victim] had provided a "dark skin black male" racial description of the suspect on the offense date. The State failed to introduce objective evidence implicating Mr. Ferrell. Had counsel impeached [the victim]'s testimony that he "never" told Officer Paz the suspect was a black male with the suspect description [the victim] provided to Officer Paz, [the victim]'s credibility would have been undermined and the outcome of the trial would have been different.

<u>[Rule 3.850] Evidentiary Hearing</u>

Counsel testified that she could have called Officer Paz as a defense witness to testify what suspect description the victim gave him but that she thought she had questioned Officer Paz about this on cross-examination. Counsel agreed she could have used Officer Paz's deposition about a dark-skinned black male to impeach his trial testimony of a black/Hispanic male, but she thought that some Hispanic people are very dark and she did not think there was a material difference between a "dark-skinned black" male and a "dark-skinned black/Hispanic" male.

Counsel cross-examined [the victim] at trial but did not find anything in his trial testimony to be inconsistent with his deposition testimony. [The vicitm] made an in-court identification of Mr. Ferrell as the person who had hit him with the pipe without hesitation. Officer Paz could not say at

trial whether it was [the victim] or Ms. Maldanado who told the officer the suspect was African-American, but the officer believed and testified at trial that he had been told the suspect was African-American.

Officer Paz testified at deposition that [the victim] had given him a description of a "dark-skinned black male." Counsel agreed that if [the victim] had told Officer Paz that the suspect was a "dark-skinned black male" on the offense date and testified at trial that [the victim] gave Officer Torres a description of a "white male" on the date of Mr. Ferrell's arrest, then [the victim]'s trial testimony was inconsistent with the description he gave to Officer Paz. However, [the victim] denied at trial that he told Officer Paz that the suspect was a dark-skinned black male. Officer Paz testified at his deposition that Ms. Maldanado gave him the "same description" of the suspect as [the victim]. Counsel believed she highlighted this discrepancy through cross-examination of Officer Paz.

Mr. Ferrell testified [at the evidentiary hearing] that [the victim] testified that he never told Officer Paz that the suspect was a black male, and counsel should have called Officer Paz to testify as a defense witness and asked whether [the victim] told the officer that the suspect was a black male.

Mr. Ferrell acknowledged that [the victim] testified at trial that Mr. Ferrell was the person who hit [him] with a metal pipe and that counsel cross-examined [the victim] at trial.

. . . .

Court Analysis

. . . .

[The victim] testified at trial that he got a "good look" at the suspect's face and he identified Mr. Ferrell as the man who approached him on February 8, 1996. . . .

. . . .

He also testified that he saw the suspect again twice after that and that the second time Mr. Ferrell was eventually arrested and that he had no doubt that it was the same man who hit him with the steel pipe.

During direct examination at trial, Officer Paz provided the following testimony about a suspect description:

> Q:  And did [the victim] give you a description of the attacker?
>
> A:  Yes, sir, he did.
>
> Q:  And do you specifically remember exactly what he told you today?
>
> A:  Not exactly today. I remember him saying that the guy was wearing an orange vest.
>
> Q:  Okay.
>
> A:  An orange vest, he was on a white bicycle — or he was on a bicycle, and I mean, I got the description in my report, but it's been so long.

Counsel elicited conflicting testimony from Officer Paz on cross-examination:

> Q:  And back on February 8th of 1996, you were given a description of the suspect by the witnesses and the victim?
>
> A:  Yes, ma'am.
>
> Q:  And when you got the description from them, they were not together at that time; isn't that true?
>
> A:  That's correct. The victim was being looked . . . at by fire rescue. When I pulled in the parking lot — pardon me — at K-Mart, fire rescue was pulling in the exact same time. My first priority was to get [the victim] some medical attention, which that's what they were doing. At that time, I still needed to find out what was going on. So that's where I turned to the witness and I got the description from the witness.
>
> Q:  And based on the description that you received, you placed a BOLO over the radio; correct?

A:  Yes, ma'am. A BOLO is "be on the lookout."

. . . .

Q:  And does this BOLO contain a physical description of the suspect?

A:  Yes, ma'am. It contains as much description as I can possibly give.

Q:  And that description that you give, you get that from the witnesses and/or the victim; correct?

A:  Yes, ma'am.

Q:  Do you recall what description you placed over on the BOLO?

A:  Some of it, not all of it. I remember that the orange vest — I mean, that stuck out. He was supposedly wearing an orange vest. He had a white bicycle. He was — I can't  remember his height and weight, but I remember it was medium build. I can refer to my report if you want an exact description.

Q:  You may do that.

A:  Okay. The description that I had that I put out as a BOLO was a possibly black or Hispanic male in his 30s, five-ten, approximately 190 pounds, hair was black, skin was dark color, eyes were unknown, and his build was medium. And he was wearing an orange safety vest — the  kind like you would wear in construction — a maroon T-shirt, brown slacks and was riding a white bicycle. And that's — that's all I have for a description.

Q:  Did you get a description as to the shoes at all that he was wearing?

A:  Yes, ma'am. Possibly white tennis shoes.

Q:  So police officers were searching the area based on a description of a black Hispanic male with dark skin, medium build. 190 pounds, five-foot-ten?

A:  Yes, ma'am. And for that safety vest too, that would — on a white bicycle that would have stuck out. Even — even if the officer would have saw somebody — if the officer would have saw somebody with an orange safety vest on a white bicycle, even if they were a bit off of the description, they probably still would have been stopped and questioned.

Q:  Would you agree with me that Mr. Ferrell does not fit that physical description that you just gave?

A:  Well, as — he fits the description. He looks Hispanic to me. As far as being black, he doesn't look black to me. He looks Hispanic. He probably looks a lot different now, cleaned up and here in the courtroom, than he would out in the street. And the white bicycle and the safety vest, again, would have been a big key.

Q:  In your —

A:  Again, I don't know if he's real tan. If he was working construction, he could have been real tan at the time. I don't know. I'm just thinking of a construction safety vest.

Q:  Thank you. And no suspect was apprehended that day; correct?

A:  No, ma'am. Not that day.

. . . .

Thus, counsel brought out during cross-examination of Officer Paz that he believed he had been given a "black or Hispanic male" description of the suspect's race. This is consistent with the description in his report that he thought Ms. Maldanado, identified as the witness in his report, told him, namely that the race of the suspect was "B/H" (black or Hispanic).

The record shows counsel cross-examined Officer Paz to show what racial description Officer Paz thought [the victim] and Ms. Maldanado had given him and that description was "black or Hispanic" as stated in his report. The evidentiary hearing testimony shows that counsel understood that it was possible that Officer Paz had misunderstood what [the victim] and Ms. Maldanado had told him about the description of the suspect. No testimony, expert or otherwise, is needed for a jury sitting in Hillsborough County to know that if a person's complexion is conducive to tanning and if that person spends almost any time outdoors, such as using a bicycle for transportation, that person could easily be "darkly tanned" and that a person's race would not be immediately apparent.

While it is true counsel could have impeached [the victim] in the way Mr. Ferrell suggests, decisions by counsel about how to cross-examine witnesses are typically tactical decisions, *see Magill v. State*, 457 So. 2d 1367, 1370 (Fla. 1984 ), nor is counsel under a duty to obtain a defendant's "express record consent to counsel's tactical decisions relating to trial strategy." *See State v. Daniels*, 826 So. 2d 1045, 1047 (Fla. 5th DCA 2002). That post-conviction counsel would have proceeded differently is not sufficient to prove that trial counsel was necessarily deficient. *See Patton v. State*, 878 So. 2d 368, 373 (Fla. 2004).

Yet another consideration, noted by counsel in her evidentiary hearing testimony, was that if she called Officer Paz as a defense witness, she would have lost "close/close" in closing argument, an advantage that defense attorneys like to have.

. . . . Counsel cross-examined [the victim], Officer Paz, and Officer Torres to show discrepancies in [the victim]'s trial testimony about the description of the suspect. The court concludes that Mr. Ferrell has failed to prove the deficient performance component of *Strickland*. No relief is warranted on [this claim].

"The inquiry into whether a lawyer has provided effective assistance is an objective one:  a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).  A habeas petitioner must overcome a

presumption that the challenged conduct of one's counsel was a matter of strategy. *Strickland,* 466 U.S. at 689; *United States v. Perry*, 908 F.2d 56,59 (6th Cir. 1990). Counsel's decision to cross-examine and the manner of the cross-examination are strategic decisions entitled to deference. *Dorsey v. Chapman*, 262 F.3d 1181 (11th Cir. 2001), *cert. denied*, 535 U.S. 1000 (2002); *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001). The only question is whether counsel's strategic decision was "reasonable." *See Minton v. Sec'y, Dep't of Corr.*, 271 Fed. App'x 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"). A defendant's disagreement with counsel's tactics or strategy will not support a claim of ineffective assistance of counsel.

The jury heard the discrepancy between the victim's testimony that he did not describe the suspect to Officer Paz as a "black male" and Officer Paz's testimony that the victim described the suspect as a "possibly black or Hispanic male." Counsel repeatedly highlighted the discrepancy throughout the trial, particularly in closing argument. Even assuming that counsel could have impeached the victim with his

earlier statements to Officer Paz, Ferrell shows no reasonable probability that the outcome of trial would have been different.  Ferrell was arrested after the victim saw him on the street one week after the crime, not as a result of the description in the BOLO from Officer Paz.  Whether the victim earlier described Ferrell as a "black male" does not undermine his unequivocal identification of Ferrell both to the police on the day of Ferrell's arrest and in court at the trial.  Even assuming that counsel performed deficiently by not impeaching the victim, Ferrell fails to demonstrate that such impeachment would have resulted in his acquittal.  Absent a showing of prejudice, Ferrell cannot obtain relief because *Strickland's* requirements remain unsatisfied.  Ferrell fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting ground eight.  28 U.S.C. § 2254(d)(1), (2).

**Ground Nine**

Suzette Maldanado[7] testified on direct examination at trial about her description of the suspect to the police (Respondent's Exhibit 1, Vol. V, p. 282):

> Q:  And did you give a description, to the best of your ability, of the man that you saw do this?
>
> A:  Yes.
>
> Q:  Did you ever describe him as a black male?
>
> A:  No.

---

[7]  At the time of trial Maldanado's last name had changed to Torres. (Respondent's Exhibit 1, Vol. V, p. 267) Because the state post-conviction court's order denying Ferrell's Rule 3.850 motion identifies Suzette using the last name "Maldanado," this order uses "Maldanado" in the discussion of Ferrell's post-conviction grounds to avoid confusion.

> Q:  Did you ever get the impression that the person who committed this offense was a black male?
>
> A:  No.
>
> . . . .
>
> Q:  Okay. Do you remember in terms of his ethnic background what kind of description you gave?
>
> A:  I said he was white or — or Latin.

Ferrell contends that his trial counsel rendered ineffective assistance by not impeaching Maldanado's trial testimony — that she did not tell the police that the suspect was a "black male" — with Officer Paz's deposition testimony that Maldonado gave the same description of the suspect as the victim — that the suspect was a "black male."

The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and motion for rehearing, pp. 116–35) (court's record citations and footnotes omitted):

> Trial Testimony of Suzette Maldanado-Torres
>
> The prosecutor asked her name and where she lived. Ms. Maldanado lived in Tampa on February 8, 1996, and remembers that the incident occurred after 5 p.m. when it was "still light out." While using the phone outside K-Mart because her car had broken down, she noticed a man standing around and then walking around and mumbling.
>
> She was able to get a good look at the man's face because he [was] very close to her and he was making her nervous. Ms. Maldanado identified Mr. Ferrell as the man who approached her that day. She was walking to her car and another man approached her and asked if something was wrong with her. She said yes, her car had broken down.

The man she had first noticed was walking around and walked towards her while she was at her car. The second man noticed the first man was looking at them. The second man asked her if she knew the first man and she said no. The first man had been walking around for about 10 minutes and was approaching them. The second man asked if he could help the first man.

The second man did not say it in a manner to provoke someone. The first man yelled something but not in a friendly manner. The men exchanged words and the first man started walking towards them. She did not see anything in the first man's hands at first but then saw something. The second man did not have anything in his hands. They started hitting each other and she saw the first man hit the second man on the head with a pipe.

The second man had a laceration on his head which was bleeding. . . . The first man maced the second man in the eyes and then left on his bicycle. The fight lasted about 20 minutes. When the police arrived, the first man was not there.

The first man seemed aggravated and like he was "on something" or "not all there." The second man did not initiate the physical violence; he was saying "take it easy" and trying to get away from the first man. The first man was the aggressor. She remembers the first man was wearing an orange reflector jacket.

She [testified at trial that she] gave the police a statement as to what she saw happen:[8]

> Q:  Okay. And when the police arrived, did you talk to the police officer?
>
> A:  Yes.
>
> Q:  And give them a statement as to what you saw happen?
>
> A:  Yes.
>
> Q:  And did you give a description, to the best of your ability, of the man that you saw do this?

---

[8]  *See* Respondent's Exhibit 1, Vol. V, p. 282.

A:  Yes.

Q:  Did you ever describe him as black male?

A:  No.

Q:  Did you ever get the impression that the person who committed this offense was a black male?

A:  No.

Q:  Do you remember how you described him?

A:  Yes.

Q:  How did you describe him?

A:  Clean-cut. He had an orange reflector jacket on. He had some type of jeans on and short, black hair.

Q:  Okay. Do you remember, in terms of his ethnic background, what kind of description you gave?

A:  I said he was white or — or Latin.

She [testified that she] met with someone from T[ampa] P[olice] D[epartment] after the offense date and looked at a series of photographs[:][9]

Q:  Did you recognize anybody in those pictures?

A:  Yes, I did.

Q:  Did you pick that person out?

A:  Yes, I did.

Q:  Was that the picture of Mr. Ferrell?

---

[9]  *See* Respondent's Exhibit 1, Vol. V, p. 284.

A:  Yes.

Q:  The same person that you saw hit [the victim] over the head with that pipe?

A:  Yes.

Q:  Any doubt in your mind?

A:  No. Uh-uh.

. . . .

Q:  Okay. Other than today, have you had contact with — first of all, you haven't had any contact with Mr. Ferrell?

A:  No.

Q:  Have you ever seen or talked to [the victim] in the past three years?

A:  No.

Counsel began her cross-examination of Ms. Maldanado as follows:[10]

Q:  Good afternoon, Ms. Torres.

A:  Good afternoon.

Q:  Right after this incident at K-Mart, you talked to the police officer about what happened?

A:  Yes.

Q:  And you gave them a description of the person you saw; is that correct?

A:  Yes.

. . . .

---

[10]  *See* Respondent's Exhibit 1, Vol. V, pp. 285–88.

Q:  Did you tell the officer that the person was a black?

A:  No.

Q:  And you testified that at some point later you spoke with another police officer, and you were shown a book with photographs?

A:  Yes.

Q:  Do you recall how many pages were in that book?

A:  I don't recall.

Q:  Do you recall specifically whether there was just one page in that book?

A:  No.

Q:  Do you have any recollection as to the number of photographs that you were shown at that time?

A:  Six to eight pictures.

Q:  And that was the total that you were shown?

A:  I didn't give him a chance — because I recognized him right away — to show me more pictures. He asked me twice if I was sure.

Q:  And taking you back to February 8th at the K-Mart, you watched the entire altercation between [the victim] and that person; correct?

A:  Yes.

. . . .

Q:  Ms. Maldanado — oh, I'm sorry. Ms. Torres, I'm taking you back to the point where you spoke to a police officer some time after this incident, and you were shown a photo pack.

A:  Uh-huh.

Q:  Isn't it true that you were only allowed to see the top portion of that — or upper torso picture of the person? Basically, a picture of their face?

A:  Yes.

Q:  And from that picture, you can't tell how much a person would weigh: correct?

A:  It doesn't matter. I recognized his face and I'll never forget his face.

. . . .

On re-direct examination, the prosecutor asked . . . :[11]

Q:  And what was the most distinctive feature of Mr. Ferrell that you remember from that particular day?

A:  His eyes.

Q:  Okay.

A:  His look.

Q:  His look. His face?

A:  Yeah.

. . . .

Allegations

Mr. Ferrell claims counsel's performance was deficient because she failed to impeach Ms. Maldanado's trial testimony that she never told Officer Paz that the assailant was a "black male" with the fact that Officer Paz testified at his deposition that Ms. Maldanado had told him the suspect was a "dark skin black male." He was prejudiced because the jury did not hear that her trial testimony was inconsistent with Officer Paz's deposition

---

[11] *See* Respondent's Exhibit 1, Vol. V, p. 291.

testimony about the suspect description she had given to Officer
Paz. Had counsel made the jury aware that Ms. Maldanado
told Officer Paz the suspect was a "dark skin black male" on the
offense date, the jury would have been able to look at Mr.
Ferrell in court and determine that he was a white male, not a
"dark skin black male." This would have led to a reasonable
probability that the jury would have reached a different
outcome at trial.

[Rule 3.850] Evidentiary Hearing

Counsel testified that she could have called Officer Paz as a
defense witness to testify that Ms. Maldanado told him the
suspect was a "dark-skinned black male," but counsel brought
this discrepancy out during her cross-examination of Officer
Paz during the State's case. Counsel thought Ms. Maldanado's
trial testimony was "fairly consistent" with her deposition
testimony. Ms. Maldanado made an in-court identification of
Mr. Ferrell as the person who had hit [the victim] without
hesitation and testified "I'll never forget his face." Counsel did
not know if Ms. Maldanado actually gave a "dark skinned black
male" description to Officer Paz but that is what the Officer
believed Ms. Maldanado had told him. Counsel did not think
that Ms. Maldanado's trial testimony was inconsistent with her
deposition testimony.

Mr. Ferrell testified that counsel failed to impeach Ms.
Maldanado's trial testimony that she did not tell Officer Paz the
suspect was a black male with the officer's deposition testimony
that Ms. Maldanado gave him a "black male" description on
the offense date. Mr. Ferrell argues that he was prejudiced
because the jury did not learn that Ms. Maldanado gave a
"black male" description to Officer Paz on the offense date.
Detective Rockhill testified that he used Mr. Ferrell's booking
photo in the photopack which the Detective showed to Ms.
Maldanado and from which she identified Mr. Ferrell's picture.
Thus, the jury never knew that Ms. Maldanado had originally
told Officer Paz that the suspect was a "black male."

On cross-examination, Mr. Ferrell agreed that Ms. Maldanado
identified him in court as the person who hit [the victim] with
the pipe. Even though counsel might have filed a motion to
prohibit a copy of the photopack being introduced into evidence
at trial, it was [co-counsel for the defense] who successfully
argued the motion to the trial court. Defense counsel tried to
prevent Ms. Maldanado from testifying about identifying Mr.

Ferrell from the photopack but the trial court denied the motion because their argument was deficient. The problem is that defense counsel failed to move to compel the State to produce discovery sooner so that defense counsel would have known sooner than they did that the State did not have the original photopack since it was lost. Defense counsel could then have prepared and argued a better motion on his behalf.

. . . .

<u>Court Analysis</u>

The jury did not see a copy of the photopack because counsel successfully argued the motion to exclude a copy of the photopack from being introduced into evidence at trial. During his deposition, Officer Paz testified that [the victim] gave him the following physical description of the suspect while referring to his Incident Report:

> . . . .

> A:  Yeah, right up here. Black male in the 30s, about five-ten, 190 pounds, black hair, dark skin, eyes unknown, he was medium built, orange safety belt, maroon T-shirt, brown slacks, white tennis shoes, and was riding a white bike. And that's all the  description I got.

> . . . .

Officer Paz testified that Ms. Maldanado gave him "the same description" that [the victim] had given him and that she could identify the suspect if she saw him again. Officer Paz used her description for the BOLO and [the victim]'s description in his report.

Ms. Maldanado testified at trial on direct examination about the suspect description she gave to Officer Paz on the offense date:

> . . . .

> Q:  Do you remember how you described him?

> A:  Yes.

Q: How did you describe him?

A: Clean-cut. He had an orange reflector jacket on. He had some type of jeans on and short, black hair.

Q: Okay. Do you remember, in terms of his ethnic background, what kind of description you gave?

A: I said he was white or — or Latin.

Counsel cross-examined Ms. Maldanado about the description she gave to Officer Paz[.]

. . . .

Q: So, the details were pretty fresh in your mind at that time?

A: Uh-huh.

Q: Did you tell the officer that the person was a black?

A: No.

Counsel cross-examined Officer Paz later during the trial about the suspect description Ms. Maldanado gave him on the offense date [that the suspect "was a possibly black or Hispanic male."

. . . .

Counsel addressed the discrepancy in her initial closing argument:

So, what have we heard about that description? We've heard from Officer Paz that the description was of a dark skinned, black male wearing beige slacks, white tennis shoes —

[PROSECUTOR]: Judge, I'm going to object. She's misquoting the testimony. The testimony was black or Hispanic dark skinned male on the stand.

- 34 -

THE COURT: Do you agree? Do you agree to the correction in the —

[COUNSEL]: No, Judge, I do not agree.

. . . .

[Officer Paz] placed that BOLO out based on that description. He also told you, Members of the Jury, a very, very, very important thing. He told that you Mr. Ferrell does not fit that description.

. . . .

Members of the Jury, Officer Paz told you that they looked for a suspect in the area. And I submit to you that Mr. Ferrell was not the suspect they were looking for. He also testified that no suspect was found. Members of the Jury, it is obvious that Mr. Ferrell does not have dark skin. It is clear in this trial that Officer Paz was given the description of someone who was [a] dark skinned, black, Hispanic male. Rely on your own recollection as to what that may be. And it's also very clear that Mr. Ferrell does not fit that description.

. . . .

But what is crystal clear, Members of the Jury, is that Officer Paz was given a description different than what Mr. Ferrell looks like. He had his colleagues looking for a person that looks different than what Mr. Ferrell looks like, and that was on the same night this incident supposedly happened. Members of the Jury, that person is not Mr. Ferrell.

The prosecutor commented during his closing argument:

[Counsel] has gone on and on and on about this black male, white male description in the police report. [The victim] told you, I told [Officer Paz] he was a white or Hispanic male. Ms. Maldanado-Torres told you white or Hispanic male.

- 35 -

> Whatever the police officer happened to put in
> his police report was clearly an error, or a portion
> of it was an error. The black portion was an error,
> because never once did anybody say anything
> about this perpetrator being a black male. It's
> clear that it wasn't a black male.
>
> . . . .
>
> Clearly there is some ethnic derivation in Mr.
> Ferrell. I'm not sure what it is. It could be
> Hispanic, it could be something else. It could be
> some sort of Latin in his background. Clearly,
> he's not strictly a white male. He's not like my
> complexion.

In her rebuttal closing argument, Counsel mentioned the
conflict again:

> Other conflict in the evidence — the descriptions
> that were given. Huge conflicts in the evidence.
> Mr. Ferrell is obviously not dark skinned. He's
> obviously not a black male. He differs from the
> height and weight descriptions that were given by
> the victim and witness. Five foot ten, 200
> pounds? That's not Mr. Ferrell, Members of the
> Jury. A conflict in the evidence. It's a conflict,
> and it's enough for you to find reasonable doubt.

Finally, Counsel linked the missing photopack to the
description issue:

> That photopack would have been concrete proof
> of what Mr. Ferrell looked like back then. You
> could have made your own determination of the
> whether that picture of him, at that time, fit the
> description that the witnesses were giving.
> Members of the Jury, that's lack of evidence, and
> that is enough for to you find reasonable doubt.

The court finds that counsel highlighted the difference in
description Mr. Ferrell wanted highlighted in a different way
than he proposes, not only through cross-examination of Ms.
Maldanado and Officer Paz but repeatedly throughout her
closing argument by references to "the description" given by

> "the witness" or that Officer Paz received. That Mr. Ferrell
> would have preferred that counsel highlight this difference in a
> different way does not mean that counsel's performance was
> deficient nor did trial counsel have to obtain explicit consent
> from a client about every tactical decision or strategy. *Nixon*, at
> 187. The court concludes that Mr. Ferrell has failed to prove the
> deficient performance component of *Strickland*. No relief is
> warranted on [this claim].

The record supports the state post-conviction court's rejection of this ground.

Even assuming deficient performance, Ferrell cannot obtain relief because he fails to

demonstrate that absent counsel's failure to further highlight the discrepancy in the

suspect descriptions as he suggests, and despite the other evidence adduced at trial,

the jury would have acquitted him. *See Rogers*, 13 F.3d at 386 ("Even if many

reasonable lawyers would not have done as defense counsel did at trial, no relief can

be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in

the circumstances, would have done so. This burden, which is [the applicant]'s to

bear, is and is supposed to be a heavy one."). Absent a demonstration of prejudice,

Ferrell cannot prevail on this claim of ineffective assistance of trial counsel.

*Strickland*, 466 U.S. at 691–92. Ferrell fails to establish either that the state court

unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this

ground. 28 U.S.C. § 2254(d)(1), (2).

**Ground Four**

Ferrell contends that his trial counsel rendered ineffective assistance by not

impeaching Officer Paz's trial testimony — that both the victim and Maldanado

described the suspect a "possibly black or Hispanic male [whose] skin was [a] dark

color" — with his deposition testimony that both the victim and Maldanado described the suspect on the day of the crime as a "black male."  Ferrell claims that the impeachment of Officer Paz was "crucial" to his defense.

The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and motion for rehearing, pp. 158–67) (court's record citations and footnotes omitted):

<u>Allegations</u>

Mr. Ferrell claims counsel failed to impeach Officer Paz's trial testimony about the suspect's description with his prior inconsistent deposition testimony. At his deposition, Officer Paz read from his Incident Report and testified unequivocally that both Ms. Maldanado and [the victim] provided a "dark skin black male" suspect description to the Officer on the offense date. When counsel questioned Officer Paz at trial about what description he used for the BOLO ("be on the lookout for") radio dispatch, Officer Paz testified equivocally that he used a "possibly black or Hispanic male — skin was dark in color" description. Counsel's failure to impeach Officer Paz's trial testimony about the suspect's description meant that the jury did not learn that Officer Paz testified at his deposition that [the victim] and Ms. Maldanado, each of whom saw the suspect face-to-face in broad daylight for a substantial period of time on the offense date, described the suspect as a "black" person on the offense date, but that Officer Paz used a "dark-skinned" description on the BOLO radio dispatch. Counsel's failure prejudiced Mr. Ferrell because he is a "white" person. Counsel's performance was deficient and but for her error, the jury would have focused on the fact that both the victim and the eyewitness initially provided a "black person" description of the suspect to Officer Paz while Mr. Ferrell, sitting before them in court, is clearly a white person. Since the description of the suspect was at the heart of the instant case, there is a reasonable probability that the outcome of the trial would have different had counsel's performance not been deficient.

<u>[Rule 3.850] Evidentiary Hearing</u>

Counsel agreed that Office Paz testified that the suspect description he received at the crime scene was that of a "[b]lack male in the 30s, about 5'10", 190 pounds, black hair, dark skin, eyes unknown, he was medium built, orange safety belt, maroon t-shirt, brown slacks, white tennis shoes, and he was riding a white bike" and that the victim and eyewitness gave him the "same description." Counsel agreed the suspect description of "black male" was important and that Mr. Ferrell was not a black male.

Counsel agreed Officer Paz testified at trial that he was given a "black or Hispanic male" description from [the victim] and Ms. Maldanado. Counsel didn't try to impeach Officer Paz at trial because she remembered that his incident report described the suspect as "black/Hispanic male." Counsel agreed that the discrepancy between Officer Paz's deposition and his trial testimony "could have been important."

Mr. Ferrell was concerned that Officer Paz put "black/Hispanic" for a suspect description in the police report but at his deposition that the suspect was a "black" male and testified at trial that he was given a suspect description of "black or Hispanic." Counsel did not think that Officer Paz's trial testimony was inconsistent with his deposition testimony.

Mr. Ferrell testified that Officer Paz read from his report at his deposition when he "unequivocally and specifically testified" that he had been given a suspect description at the crime scene of a "dark-skinned black male." Ms. Maldanado gave him that description which the Officer used on the "BOLO" report and then [the victim] gave the Officer the same description. At trial, Officer Paz testified "equivocally and differently" that the suspect description he received was of a "dark-skinned black or Hispanic male." Counsel should have impeached Officer Paz with his prior deposition testimony because the State had acknowledged that the case was a misidentification case, it was the defense theory, and the State had lost the tangible evidence.

. . . . Counsel should have raised the issue of whether the police reports were "reconstructed" after they were lost. Mr. Ferrell suggested this to Counsel but she did not present this adversarial issue at trial.

. . . .

- 39 -

Court Analysis

The Court notes that A[ssistant] P[ublic] D[efender]
Vizcarra [who did not represent Ferrell at trial] conducted the
deposition of Officer Paz. Counsel reviewed the Officer's
deposition before trial. Counsel didn't try to impeach Officer
Paz's trial testimony that [the victim] and Ms. Maldanado told
him the suspect was a "black or Hispanic male" because she
remembered that Officer Paz had indicated the suspect's race
was a "black or Hispanic male" in his report.

By the time that Officer Paz testified at trial, [the victim] and
Ms. Maldanado had each flatly denied that they had ever told
the Officer that the suspect was a "black male."

. . . .

Counsel highlighted the fact that Mr. Ferrell did not match the
description given to Officer Paz by [the victim] and Ms.
Maldanado in her initial closing argument[.]

. . . .

Although the prosecutor objected that counsel was
mischaracterizing the evidence, the court instructed the jury to
rely on their recollection of the evidence and did not instruct the
jury to disregard counsel's argument.

. . . .

[W]hile it is true that counsel did not impeach Officer Paz's trial
testimony with deposition testimony that she did not hear,
counsel clearly questioned [the victim] and Ms. Maldanado
about what suspect racial description each had given to Officer
Paz, attempted to have each testify that a "black male"
description had been given to Officer Paz, highlighted that Mr.
Ferrell did not fit the description of a "dark-skinned black" or
"dark-skinned Hispanic male" during her cross-examination of
Officer Paz, and highlighted that Mr. Ferrell did not fit the
description of "black male" or "black or Hispanic male" during
closing argument. The Court believes the jury gave great weight
to the in-court identification of Mr. Ferrell by [the victim] and
by Ms. Maldanado. Even if counsel had brought out the
difference between Officer Paz's deposition testimony and his
trial testimony, the jury was clearly able to look at Mr. Ferrell

> for themselves and determine whether he looked Hispanic or
> was more dark-skinned than other white people. The trial judge
> himself said during jury selection that he could not determine
> the race of Mr. Ferrell.
>
> . . . .
>
> The court concludes that Mr. Ferrell has failed to prove the
> prejudice prong of *Strickland*. No relief is warranted on [this
> claim].

Both Beck and Maldanado testified at trial that they got a good look at

Ferrell's face at the time of the crime.  Both also testified that they did not

describe Ferrell as a "black male" to the police.  (Respondent's Exhibit 1, Vol. V,

pp. 238–39, 252–53, 259, 271, 282)  Counsel in her closing argument implored

the jury to acquit Ferrell based on misidentification, conflicts in the evidence,

and lack of physical evidence.  (Respondent's Exhibit 1, Vol. VI, pp. 365–76,

398–412)  Even  assuming that counsel performed deficiently by not impeaching

Officer Paz with his deposition testimony, Ferrell is not entitled to relief because he

fails to show a reasonable probability exists that impeaching Officer Paz, despite

both eyewitnesses unequivocally identifying Ferrell as the suspect, would have

resulted in his acquittal.  The state post-conviction court neither unreasonably

applied *Strickland* nor unreasonably determined the facts by rejecting this ground.

28 U.S.C. § 2254(d)(1), (2).

**Ground Seven**

Ferrell contends that his trial counsel rendered ineffective assistance by not

moving to strike an "unresponsive and inadmissible speculative answer" by Officer

Paz and by not requesting a curative instruction.  When counsel asked Officer Paz on

cross-examination at trial whether he agreed that Ferrell did not fit the description in

the BOLO, Officer Paz testified (Respondent's Exhibit 1, Vol. V, pp. 300–02)

(emphasis added):

> A:  Well, as — he fits the description. He looks Hispanic to me.
> As far as being black, he doesn't look black to me. He looks
> Hispanic. He probably looks a lot different now, cleaned up and
> here in the courtroom, than he would out in the street.  And the
> white bicycle and the safety vest, again, would have been a big
> key.
>
> . . . .
>
> *Again, I don't know if he's real tan. If he was working construction he*
> *could have been real tan at the time. I don't know. I'm just thinking of*
> *a construction safety vest.*

Ferrell argues that this "wrongly admitted" testimony "allowed the prosecutor

to speciously negate the conflict between the state's evidence of such suspect

description and [Ferrell]'s courtroom appearance, use it to argue as a fabricated

unrebuttable presumption probative of [Ferrell]'s guilt, improperly bolster [the

victim]'s and Ms. Maldanado's credibility . . . and invade the province of the

jury . . . ." (Doc. 20, p. 22)  Ferrell claims that counsel should have requested a

curative instruction directing the jury to disregard Office Paz's "unresponsive"

answer that Ferrell may have been "real tan" and directing Officer Paz "to answer

only the questions asked." (Doc. 1, p. 15)

The state post-conviction court summarily denied this ground (Respondent's

Exhibit 6, Vol. IV, December 2002 order denying in part the amended Rule 3.850

motion, p. 8) (court's record citations omitted):

Defendant alleges ineffective assistance of counsel for failure to move to strike an unresponsive and inadmissible speculative answer at trial of Officer Roy G. Paz and request a curative instruction. Defendant contends that during cross-examination, after having elicited from Officer Paz that police were looking for a "black Hispanic male with dark skin," Officer Paz without being asked interjected the following:

. . . .

Again, I don't know if he's real tan. If he was working construction he could have been real tan at the time. I don't know. I'm just thinking of a construction safety vest.

Defendant claims that the portion of Officer Paz's testimony concluding the orange safety vest was like that worn in construction, implying that Defendant was so employed, so therefore Defendant must have been "real tan" at the time of the crime charged was unsolicited and thereby an unresponsive answer to counsel's question. However, contrary to Defendant's assertion, the statement made by Officer Paz was not unsolicited but rather was made in response to counsel's questioning of Officer Paz regarding whether or not Defendant had fit the physical description given by the officer earlier in his testimony. Defendant fails to meet the first prong of the *Strickland* test and, as such, no relief is warranted with respect to this claim of Defendant's motion.

As the state post-conviction court noted, the portion of Officer Paz's answer that Ferrell challenges was responsive to counsel's question of whether Officer Paz believed Ferrell matched the description in the BOLO — that the answer included more information than Ferrell anticipated does not render the answer "unsolicited." Ferrell provides no basis for counsel to have requested a curative instruction. Both the state post-conviction court in rejecting this ground of ineffective assistance of counsel and the state district court of appeal in affirming that rejection have answered the question of what would have happened if counsel had both moved to strike

Officer Paz's answer and requested a curative instruction.  *See Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters."); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected to the introduction of [petitioner's] statements based on [state law] – the objection would have been overruled . . . . Therefore, [petitioner's counsel] was not ineffective for failing to make that objection.").  Ferrell shows neither deficient performance nor resulting prejudice from counsel's failure to either move to strike Officer Paz's answer or to request a curative instruction.  *Strickland*, 466 U.S. at 691–92.  This ground warrants no relief because Ferrell fails to meet his burden of proving that the state court unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground.  28 U.S.C. § 2254(d)(1), (2).

**Ground Five**

Ferrell contends that his trial counsel rendered ineffective assistance by not eliciting testimony from Officer Torres that he arrested Ferrell based on a description from the victim that the suspect was a "white male."[12]  Ferrell claims that this

---

[12]  Officer Torres's criminal report affidavit from the day of Ferrell's arrest designates Ferrell's race as "white." (Respondent's Exhibit 1, Vol. II, p. 324)

description "was crucial to the identification issue at trial and critical to the credibility of the state's case because such identification evidence would have presented to the jury a conflict in the state's identification evidence at trial." (Doc. 1, p. 11)

The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and motion for rehearing, pp. 167–72) (court's record citations and footnote omitted):

> <u>Allegations</u>
>
> Mr. Ferrell claims counsel failed to elicit trial testimony from Officer Torres that while on patrol on February 15, 1996, [the victim] approached the Officer and told him that the "white male" suspect was nearby, a fact Officer Torres testified to in his deposition.[13] Counsel also failed to highlight the difference

---

[13]  In his deposition Officer Torres stated that when the victim approached him on the street one week after the crime the victim described Ferrell as "a white male, approximately thirty years of age, wearing a purple shirt, blue jeans, and a bright orange traffic vest." (Respondent's Exhibit 6, Vol. III, December 30, 1998 deposition of Officer David Torres, p. 5) Officer Torres testified at trial about his encounter with Ferrell (Respondent's Exhibit 1, Vol. V, pp. 312–13):

> Q:  Okay. Officer Torres, did you eventually approach this person that was pointed out to you?
>
> A:  Yes.
>
> Q:  And did you ascertain his name?
>
> A:  Yes.
>
> Q:  What was his name?
>
> A:  Neil Lenwood Ferrell.
>
> Q:  Okay. And did he — at the time that you talked to [the victim] did he give you a description of this person?
>
> A:  Yes.
>
> Q:  Did the person that you confronted and identified as Mr. Neil Ferrell, did he match the description?

(continued...)

between the Officer's deposition testimony that he arrested Mr. Ferrell based on a "white male" description and the Officer's trial testimony that [the victim] and Ms. Maldanado told Officer Paz that the suspect was a "dark skin black Hispanic male." The suspect's race was a key issue in identifying Mr. Ferrell at trial. Counsel's failures prejudiced Mr. Ferrell because the jury did not learn that [the victim] had provided different racial descriptions to the police and that these descriptions conflicted with Ms. Maldanado's photopack identification of Mr. Ferrell. Had Counsel elicited trial testimony from Officer Torres that [the victim] provided a "white male" description of the suspect to Officer Torres immediately prior to Mr. Ferrell's arrest but had provided Officer Paz with a "dark skin black Hispanic" male description the week before, the jury would have learned that [the victim] provided conflicting racial descriptions of the suspect to the police.

[Rule 3.850] Evidentiary Hearing

Counsel testified that Officer Torres arrested Mr. Ferrell because [the victim] pointed out Mr. Ferrell to Officer Torres. She agreed that Officer Torres testified at his deposition that [the victim] gave the officer a "white male" description on February 15, 1996. Officer Paz's police report showed the suspect was a "black/Hispanic" person based on descriptions provided by [the victim] and Ms. Maldanado. [The victim] and Ms. Maldanado testified at trial that they never told Officer Paz the suspect was a "black person." . . . . Counsel did not pursue this line of questioning with Officer Torres because he was not present on the offense date when [the victim] and Ms. Maldonado provided their descriptions of the suspect to Officer Paz. Counsel asked Officer Paz about this discrepancy at trial.

[The victim] and Ms. Maldanado identified Mr. Ferrell at trial without any hesitation or doubts. Counsel pointed out the conflicts in the suspect's racial description at trial and argued this issue in closing argument. . . . [The victim] pointed out the suspect to the arresting officer, Officer Torres, so Mr. Ferrell's arrest was not based on a racial description alone or on Officer Paz's report.

---

[13](...continued)

. . . .

A:  He gave me a description and he did match the description.

Mr. Ferrell testified [at the Rule 3.850 evidentiary hearing] that Officer Torres testified at his deposition that he received a "white male" suspect description from [the victim] on February 15, 1996, the date Mr. Ferrell was arrested, and that Officer Torres put this description in his auxiliary report. Counsel should have brought these points out when Officer Torres testified at trial to let the jury know that [the victim] had described the suspect as a "white male" to Officer Torres in contrast to the "dark-skinned black or Hispanic" description [the victim] testified to at trial.

On cross-examination, Mr. Ferrell testified that he had already been placed under arrest when [the victim] was brought to see him and that [the victim] identified the bicycle Mr. Ferrell had as "the same bicycle." Mr. Ferrell does not know if [the victim] identified him as the suspect to Officer Torres. The police report said the suspect had a bicycle and left on a bicycle and when Mr. Ferrell was arrested, he had a bicycle with him. Counsel argued during closing argument that Mr. Ferrell did not fit the suspect description but she did not bring out all the inconsistencies about the suspect description that she could have. Mr. Ferrell sat next to [co-counsel] at trial and repeatedly asked counsel and [co-counsel] during cross-examination of the State's witnesses why they weren't asking various questions.

. . . .

<u>Court Analysis</u>

On February 15, 1996, [the victim] provided the street location and a brief description of the man who had attacked [him] to Officer Torres who was on routine patrol duty. The officer went to the location and saw the man [the victim] had described and arrested the man on a misdemeanor charge. The man was Mr. Ferrell. Officer Torres wrote in his Auxiliary Report that the description he received from [the victim] was a "W/M, 30 YOA, wearing a purple shirt, blue jeans, and a bright orange traffic vest." Officer Torres testified to the same description at his December 1998 deposition, probably while reading from his report but the court cannot conclusively make that determination.

Counsel did not elicit trial testimony from Officer Torres that his deposition testimony was that [the victim] gave Officer Torres a "white male" description on February 15, 1996, when

[the victim] saw Mr. Ferrell in public and found a police officer
to arrest him.

The court agrees that highlighting this difference may well
have led the jury to question [the victim]'s credibility and his
in-court identification of Mr. Ferrell. Counsel conducted Officer
Torres's deposition and thus had first-hand knowledge about
whether the deposition transcript was accurate as to the
description that Officer Torres testified [the victim] gave him.
On the other hand, counsel's closing argument appears
designed to focus the jury's attention on the fact that the police
did not find the suspect on the offense date based on the
descriptions provided by [the victim] and Ms. Maldanado, the
difference between Mr. Ferrell's estimated height and weight
provided to the police differed significantly from his actual
height and weight as shown on the criminal report affidavits,
and the jury members could determine for themselves at any
time during the trial whether Mr. Ferrell fit a description of
"white" and did not match the "black male" or "black or
Hispanic male" descriptions provided by [the victim] and Ms.
Maldanado.

Although counsel did not testify to the following at the
evidentiary hearing, the court understands that counsel had to
focus on an "angle" for the misidentification defense that would
be readily comprehensible to the jury and which she could
maintain consistently throughout questioning of the witnesses.
In other words, counsel focused on Officer Paz's testimony that
he received a "black male" and "black or Hispanic male"
description from [the victim] and Ms. Maldanado on the
offense date and repeatedly highlighted that he was not black or
Hispanic throughout cross-examination of each of the State's
witnesses and in her closing argument. Having taken that angle,
it might be confusing to the jury for counsel to also argue that
"[the victim] said Mr. Ferrell is white." This was a reasonable
trial strategy decision on counsel's part. The Court finds that
counsel's performance was not deficient. Mr. Ferrell has failed
to prove the prejudice component of *Strickland*. No relief is
warranted on [this claim].

Ferrell offers no evidence showing that counsel's decision to forego

questioning Officer Torres about the victim's description was anything other than a

strategic choice.  Officer Torres arrested Ferrell after the victim identified Ferrell on

- 48 -

the street as the man that attacked him, not as a result of the suspect description

in Officer Torres's report.  Ferrell does not establish that trial counsel's performance

fell outside the bounds of reasonable professional judgment.  *See Chandler*, 218 F.3d

at 1314 (finding that "counsel cannot be adjudged incompetent for performing in

a particular way in a case, as long as the approach taken 'might be considered

sound trial strategy'") (quoting *Darden v. Wainwright*, 477 U.S. 168 (1986)).

Ferrell fails to demonstrate that the jury would have acquitted him had counsel

pursued the strategy he proposes.  The state court neither unreasonably applied

*Strickland* nor unreasonably determined the facts by rejecting this ground. 28 U.S.C.

§ 2254(d)(1), (2).

## B.  Closing argument

Ferrell's remaining two grounds of ineffective assistance of counsel challenge

counsel's performance in closing argument.

## Ground Eleven

Ferrell contends that his trial counsel rendered ineffective assistance by

"practically conceding" in closing argument Ferrell's guilt without his consent.

To support this ground Ferrell cites the following excerpt of counsel's initial closing

argument (Respondent's Exhibit 1, Vol. VIII, p. 368) (emphasis added):

> [The state] expect[s] you to rely on just the testimony and I
> submit to you that that is just not enough. [The prosecutor] has
> failed in his burden here today to prove that any aggravated
> battery occurred with a deadly weapon. And he's done that
> because you cannot make the determination that the weapon
> was, in fact, a deadly weapon.

> *The most that they could have possibly proven here — the most —*
> *the very most is a battery.* And I say that because you cannot
> determine whether or not the weapon was deadly without being
> able to evaluate it for yourselves.

Ferrell contends that counsel again conceded his guilt in her rebuttal closing

argument (Respondent's Exhibit 1, Vol. VIII, p. 410) (emphasis added):

> Members of the Jury, reasonable doubt has arisen in this trial
> every single way that it can possibly arise. [The prosecutor] has
> failed in his burden here. He's failed to prove that an aggravated
> battery happened and he's failed to do that because he's not
> giving you the equipment that you need to make that decision.
> He has not brought the weapon to you for you to evaluate for
> yourselves.
>
> *And I say that the most . . . they have proved is a battery . . .* because
> he has failed to do that simple thing.

Ferrell also argues that counsel's closing argument was "legally . . . invalid because

the trial court ruled under Florida law [that] the State could adduce victim injury

testimony at trial in lieu of [the] steel pipe/rod which allowed the jury to reach its

verdict based on victim injury testimony."  (Doc. 1, p. 23)

The state post-conviction court denied this ground after an evidentiary hearing

(Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and

motion for rehearing, pp. 177–96) (court's record citations omitted) (emphasis in

original):

> <u>Allegations</u>
>
> Mr. Ferrell claims that Counsel practically conceded his guilt to
> the instant offense without obtaining his prior record consent by
> stating twice during closing argument that, "The most that [the
> State] could have possibly proven here — the most — the very
> most is a battery," . . . , "I say the most thing [the State has]
> proven is a battery." He filed a *pro se* Notice of Alibi before trial
> with information showing where he was at the time of the

offense and he requested that Counsel present a "mistaken identity" defense. The Notice shows he intended to hold the State to its burden of proof of the instant offense and lesser-included offenses. At no time did he change his not guilty plea or concede his guilt by testifying thereto. Counsel's statements told the jury that the State had established that Mr. Ferrell was guilty of an element of the instant offense, "physical battery." Counsel unsuccessfully and erroneously argued a pretrial motion to exclude "victim injury" evidence. The State correctly argued that "victim injury" evidence was admissible based on *Brooks v. State*, 725 So. 2d 341 (Fla. 5th DCA 1999). Counsel should have known that the jury only had to find evidence of victim injuries of "great bodily harm" to convict him of the charged crime if they believed he was the perpetrator. Because the steel rod was not introduced into evidence, Counsel should have known that her statement conceded that Mr. Ferrell was the perpetrator. Counsel did not obtain his written or record verbal consent to concede guilt to a battery and she did not discuss her intended argument with him. The jury heard her statement just prior to retiring to deliberate. This constitutes deficient performance.

Mr. Ferrell was prejudiced by her statements because identification of him by [the victim] and Ms. Maldanado was at the heart of the State's case, especially since the State did not introduce any physical evidence that implicated Mr. Ferrell. Counsel refused to present his mistaken identification/alibi defense and left the State's case unrefuted; she failed to object and move for a mistrial based on an improper prosecutorial suggestion that the defense was self-defense; and she argued inconsistent defense theories. These failures prejudiced him because this invited the jury to convict him and Counsel sent the unmistakable message to the jury that she believed he was the perpetrator. Counsel annihilated his right to a presumption of innocence, effectively relieved the State of its burden of proof, and invaded the jury's province by minimizing the jury's role. But for Counsel's errors, the jury would have had a reasonable doubt as to his guilt and would have found him innocent based on a mistaken identification defense. He cites cases discussing "practical concession of guilt" and the "functional equivalent of a guilty plea," including *Nixon v. Singletary*, 758 So. 2d 618 (Fla. 2000), and *State v. Cronic*, 466 U.S. 648 (1934), and argues that no *Strickland* showing of prejudice need be made.

In his [a]mended [c]laim . . . Mr. Ferrell adds that if the Court
finds he consented to Counsel's arguing his guilt to battery, the
consent is invalid because Mr. Ferrell relied on incompetent
advice from Counsel. Counsel did not understand governing
case law as to the admissibility of evidence pertaining to victim
injury.

[Rule 3.850] Evidentiary Hearing

Counsel testified that she did not recall discussing her intention
to argue that "the most he could be convicted of was a battery"
to the jury with Mr. Ferrell. She believed her argument was that
"the most the State could prove in this situation was a battery,
but not that Mr. Ferrell could be convicted of the battery." Her
intent was to argue first, that the State had to prove a crime
occurred and second, that Mr. Ferrell was the one who
committed the crime. She thought she made it clear to the jury
that "the most that could have been established as a crime being
committed by any person would be a battery because there was
no weapon that was introduced to the jury or introduced into
evidence."

Counsel acknowledged that Mr. Ferrell never asked her to
argue about lesser-included defenses. Because he had been
charged with Aggravated Battery "with a deadly weapon," the
State had to prove a weapon was involved. Counsel did not
think that arguing, "If you believe that this is the person that
was there, the most he could be convicted of is a battery,"
concedes that the person committed the charged crime or is
contrary to a mistaken identity defense. The prosecutor argued
that she had argued inconsistent theories but she clarified what
she meant in the last part of her closing argument.

Counsel did not think she conceded Mr. Ferrell's guilt or
conceded that he was, in fact, at the crime scene in her closing
argument. The "deadly weapon" portion of her argument was
to "sort of put lesser included offenses in front of the jury" to
lessen his potential exposure to the highest crime charged so
that instead of facing a 30-year prison HFO sentence, he might
face a one (1) year county jail sentence for battery. Counsel
purposely argued that the State had to prove an aggravated
battery occurred and that Mr. Ferrell was the person who
committed the crime so the jury would conclude that only a
battery was committed and that "Mr. Ferrell was the person
that committed it was the misidentification." Counsel got the

idea to argue this way from the standard jury instructions for
Aggravated Battery.

Mr. Ferrell testified [at the Rule 3.850 evidentiary hearing] that
Counsel knew his defense theory was mistaken identity with an
alibi. He complained to the trial court about Counsel's lack of
action to develop this defense numerous times. The Court
received Defense Composite Exhibit #3, multiple court
proceedings transcripts, and the June 26, 2003, transcript into
evidence. Mr. Ferrell referred specifically to the March 1, 1999,
hearing before Judge Padgett where the trial court directed
Counsel to present the misidentification defense that Mr. Ferrell
wanted at trial. Mr. Ferrell also told the Court that his *pro se*
motions had not been ruled on. Counsel argued that because
the State failed to introduce a weapon for the jury to determine
if it was a deadly weapon, then the most the State "could have
possibly proven here, the most, the very most is a battery."
Thus, Counsel practically conceded that Mr. Ferrell was the
suspect to the jury. The prosecutor analogized the lack of the
weapon to the lack of a gun and a knife and that the State didn't
have to produce a weapon, all they needed to know was that
there was injury. Counsel repeated the argument in her second
closing argument. Even though she didn't come right out and
say "the Defendant committed the crime," Mr. Ferrell was the
only defendant present. She opened the door to having the State
make the defense "look ridiculous." Counsel never discussed
that she was going to make this argument with him and had
Counsel done so, he would not have consented to it.

Counsel "presented no defense" because in her opening
statement she did not tell the jury what the defense theory was;
in closing argument, she never told the jury what the defense
theory was; and "when it came time to present a defense, they
rested the defense" which had a chilling effect on the jury. The
jury expected him to testify. Counsel "told that I committed a
battery." He understands that as a HFO, if convicted of
aggravated battery, he could be sentenced to 30 years in prison;
if the jury had convicted him of the lesser offense of simple
battery, he could be sentenced to 12 months county jail; that the
pipe was not recovered after the incident; and no medical
records showing great bodily harm were introduced into
evidence at trial nor did a medical expert testify about [the
victim]'s injuries.

The State had to prove "specific intent" to cause death, great
bodily harm, permanent disability or permanent disfigurement;

had to prove battery; and had to prove a deadly weapon, but did not have to introduce a weapon into evidence to prove aggravated battery. All the State had to prove was sufficient injury. Counsel made a "legally erroneous" argument by relying on *Clark v. State*, 632 So. 2d 88 (Fla. 4th DCA 1994), because the Fourth District Court of Appeal receded from *Clark* in *T.B. v. State*, 669 So. 2d 1085 (Fla. 4th DCA 1996). Counsel should have been aware of *Brooks v. State*, 726 So. 2d 341 (Fla. 5th DCA 1999).

. . . .

Court Analysis

The *per se* ineffective rule enunciated in *Nixon v. Singletary*, 758 So. 2d 618 (Fla. 2000), that no showing of *Strickland* prejudice need be made if counsel concedes a defendant's guilt at trial without a defendant's prior consent, cited by Mr. Ferrell, is  no longer in effect. *See Nixon v. State*, 932 So. 2d 1009, 1016–17 (Fla. 2006) (discussing United States Supreme Court opinion in *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004)). Thus, Mr. Ferrell must prove prejudice as to this claim.

. . . .

The trial court instructed the jury that Mr. Ferrell was accused of "the crime of Aggravated Battery with a Deadly Weapon" and that the State had to prove:

> THE COURT: [ . . . . ] First, aggravated battery. Before you can find the Defendant guilty of aggravated battery, the State must prove the following two elements beyond a reasonable doubt. The first element is the definition of battery.
>
> One, Neil Lenwood Ferrell intentionally touched or struck Robert Howard Beck against his will.
>
> Second, Neil Lenwood Ferrell, in committing that battery, used a deadly weapon. A weapon is a deadly weapon if it is used or threatened to be used in a way likely to produce death or great bodily harm.

. . . .

In Counsel's initial closing argument, Counsel says:

> Members of the Jury, [the prosecutor] has failed
> to [prove the crime charged occurred]. <u>In this trial
> there are two things that he must prove to you</u>.
> The State has charged the crime of aggravated
> battery with a deadly weapon.
>
> First, he must prove that that crime actually
> happened. Members of the Jury, he has failed to
> do that. <u>The State has failed to produce this
> alleged weapon</u>, a weapon that you have not been
> able to see, a weapon that you have not been able
> to feel, a weapon that you have not been able to
> evaluate for yourself.
>
> . . . .
>
> And you need it for this reason:  The Judge will
> instruct you that in order to find a finding of guilt
> based on aggravated battery with a deadly
> weapon, <u>you must make the determination that
> the weapon was, in fact, a deadly weapon</u>.

After discussing the jury's role as fact finder in relation to the
alleged deadly weapon, Counsel sums up this part of her
argument:

> They expect you to rely on just the testimony,
> and I submit to you that that is just not enough.
> [The prosecutor] has failed in his burden here
> today to <u>prove that any aggravated battery
> occurred with a deadly weapon</u>. And he's done
> that because <u>you cannot make the determination
> that the weapon was, in fact, a deadly weapon</u>.
>
> <u>The most that they could have possibly proved
> here — the most — the very most is a battery.
> And I say that because you cannot determine
> whether or not the weapon was deadly without
> being able to evaluate it for yourselves.</u>

And then argues the misidentification defense requested by Mr. Ferrell:

> <u>The second thing that they must prove is that Mr. Ferrell was actually the person who committed a crime</u> back on February 8th of 1996, at the K-Mart.

> We have heard from two witnesses about an event that happened on February 8th, 1996, at K-Mart over on Florida Avenue and Waters. <u>We have heard that a description of a suspect was given to the police</u>.

> The witnesses testified that the police came out, that they gave them — told them what happened — told Officer Paz what happened, <u>gave them a description of a suspect</u>. They did this soon after the incident happened. They did it when it was still fresh in their minds.

Thus, Counsel focused the jury's attention on a missing piece of evidence, the alleged deadly weapon, and then transitioned to Mr. Ferrell's preferred defense theory, misidentification. She argued that because the State had failed to introduce an alleged "deadly weapon'" at trial, the jury could not convict anyone of Aggravated Battery with a Deadly Weapon. Counsel only made reference to a "person" in the form of "they," the State, but did not use language like "Mr. Ferrell," "this Defendant," "a defendant," "the person arrested," or any other general description of Mr. Ferrell or his status in this portion of her closing argument.

Counsel then argued that Mr. Ferrell was not the person who did whatever happened and summarized the defense theory in a single precise sentence: "The second thing that they must prove is that Mr. Ferrell was actually the person who committed a crime back on February 8th of 1996, at the K-Mart." Counsel's transition from the "an aggravated battery was not committed" argument to the "misidentification" portion of her argument is clearly and ably articulated. It is only in the second part of her argument that Counsel mentions Mr. Ferrell.

After a few opening remarks, the prosecutor argued:

But what I first want to talk about is what [counsel] was talking about just a moment ago. I'm trying to figure out what exactly is the defense. What is she saying that we did not prove?

First, <u>she's saying that it's not an aggravated battery, it's a battery. In other words, he did it. Mr. Ferrell did it</u>. And she's saying it wasn't as serious because we didn't have the pipe, even though you heard the evidence of a split — head being split open and blood and the lacerations. <u>So he did it but he didn't commit an aggravated battery</u>. He simply committed a battery. That's one defense that she's thrown out at you.

<u>The other defense is he didn't do it</u>. It was somebody else. We didn't prove it was him. I can't figure that out, can you? <u>Can't just take everything, make a possible defense, crumple it up, throw it against the wall until something sticks</u>. That's not the way this works.

What is the defense? He did it or he didn't do it. <u>He did it, but he only committed a battery, not an aggravated battery. You can't have it both ways</u>. When she gets back up here, I want you to hold her to a defense. What is the defense?

And I submit to you, Ladies, that even she knows the State has proven beyond a reasonable doubt that it was an aggravated battery and that it was Mr. Ferrell who committed this aggravated battery.

<u>So, either way, whatever sticks up there we've proven our case</u>. We've proven that an aggravated battery occurred, that he used that pipe in a way which would cause great bodily harm or death, and he did it.

The prosecutor then argues:

Let's talk about the elements. This is exactly what you're going to receive back there, verbatim. Neil Ferrell — this is what the State needs to

prove — Neil Lenwood Ferrell intentionally
touched or struck [the victim] against his will.

Possibly that's — that's not even an issue,
because she basically admitted in one of her
defenses that it's not an agg[ravated] bat[tery], it's
a battery. So, that's not even an issue. Neil
Lenwood Ferrell, element two, in committing the
battery used a deadly weapon. That makes it the
aggravated battery, the deadly weapon portion of
this instruction.

<u>Now, right under there — and you're going to
read this — a weapon is a deadly weapon if it is
used or threatened to be used in a way likely to
produce death or great bodily harm</u>.

Now, this is where common sense comes in. This
is where simple, everyday common sense comes
in. You take a pipe, or a rod, that's 2 feet long,
anywhere from 2 to 4 pounds in weight, and you
bring it down on somebody's head like that. Is
that being used in a way that can kill them or
cause great bodily harm to them? That's common
sense. Absolutely. Of course.

It's not a battery. It's not simply touching
somebody against their will. He bashed him in
the head with a pipe. Was that weapon used as a
deadly weapon? Of course, Ladies, of course.
That's common sense.

. . . .

In Counsel's rebuttal closing argument, she says "the number
of witnesses does not equal proof" and then immediately
addresses the prosecutor's "what is the defense?" question:

It's interesting that his version is that we are
presenting two separate defenses. I submit to you,
Members of the Jury, that is not the case. There is
only one defense:  That they have failed in their
burden here. They've failed to prove that an
aggravated battery happened in the first sense.
They have failed to prove that a crime was
committed. And they failed to prove that Mr.

- 58 -

Ferrell was the one who in fact committed that
crime.

. . . .

Counsel finishes her rebuttal closing argument with comments
about the State's burden of proof, its presentation of only some
"pieces of the puzzle" and reminding the jury of the conflicts in
the evidence.

After Judge Steinberg gave the jury instructions and the jury
retired, the Court complimented all counsel. Mr. Ferrell
addressed the Court about the prosecution including facts not in
evidence in his closing argument:

> THE DEFENDANT: Yes, Your Honor.
> Citing the United States versus Rosa, 17
> Federal Reporter 3 D1531, it is improper for
> the prosecutor to mischaracterize evidence or
> refer to separation — summation to facts not
> in evidence. I find six things here that I feel
> that I feel that . . . the State's attorney [h]as
> misrepresented the facts to the jury. And he
> admitted — when he states the defense counsel
> admitted it was not aggravated battery but it was
> battery. We did not present this as a defense.
>
> . . . .
>
> [S]elf-defense was not submitted as a . . . defense.
>
> . . . .
>
> And one last thing, an objection here. Based upon
> the context of this particular case, the State has
> no physical evidence here so that we can 6th
> amendment cross-examine expert witness, touch
> it, feel it, we don't know. Such inference was
> disallowed in State verses Norse, 168 Southern
> Reporter 2D 541, the 1st District Court of
> Appeals. Now, I believe that's all I have to say,
> Your Honor.

Thus, among other things, Mr. Ferrell repeats the same points
of Counsel's rebuttal closing argument, namely that (1) the

State did not introduce a "deadly" weapon to prove that the "aggravated" portion of aggravated battery had occurred and (2) "we are not arguing self-defense."

The Court finds that Counsel did not discuss that she planned to argue the "at most" argument with Mr. Ferrell prior to arguing it during closing argument. Given that the State did not announce the weapon was lost until just before the jury was seated for trial on the morning of March 3, 1999, and that Counsel had to act quickly to develop a motion response and presumably modify her opening statement and planned questions for the State's witnesses for trial that morning and afternoon, it is somewhat understandable that she did not.

Florida law recognizes a distinction between an "at most" or "at best" argument and when defense counsel expressly concedes that their client committed the charged crime. *See McNeal v. Wainwright*, 722 F. 2d 674 (11th Cir. 1984). Such an argument, depending on the evidence at bar, may be a legitimate tactical decision. *See Prince v. State*, 889 So. 2d 976, 978–79 (Fla. 4th DCA 2004 ), and cases cited therein.

In the instant case, [the victim] and Ms. Maldanado, who were strangers to each other before and after Mr. Ferrell's arrest, each made an out-of-court identification and an in-court identification that Mr. Ferrell was the man who hit [the victim] with a steel pipe which caused bleeding on [the victim]'s head. Although there were inconsistencies and differences in the testimony of the State witnesses which Counsel addressed through her cross-examination of each witness and in her closing argument, the outcome of the trial depended on whether the jury believed the testimony regarding these basic facts.

Even if the trial court had permitted Counsel to impeach [the victim]'s testimony based on a prior felony conviction and the jury did not believe one bit of [the victim]'s testimony, the testimony of Ms. Maldanado and Officer Paz who saw that [the victim] was injured would have been sufficient for a conviction. This Court concludes that in light of this evidence and given that Mr. Ferrell was facing a habitualized sentence of 30 years in prison versus a year in jail, that Counsel made a reasonable tactical decision to make the "at most" argument.

In point of fact and law, the jury could have concluded that the State had not proved that a "deadly" weapon was involved and that only a battery had occurred or that no battery had

occurred. The jury could also have concluded as a separate matter that the State had not proved that Mr. Ferrell was the one who was involved in the situation at all.

The Court recognizes that arguments can be made that some jurors and attorneys might not interpret her closing argument as she intended or that she should have reversed the order of the two parts to her closing argument by first arguing "misidentification" and then arguing "not aggravated battery." Just as readily, an argument can be made that she presented the more "tangible" issue first, the missing alleged deadly weapon, to gain ground with the jury and then tackled the more complex "conflicts in evidence" argument to show that the State arrested the wrong man.

Given that both [the victim] and Ms. Maldanado testified that they saw Mr. Ferrell for 15 to 20 minutes in daylight, that [the victim] saw him about a week later and that Ms. Maldanado identified his picture from a photopack and would "never forget his face," and that each of them identified him at trial "without hesitation" notwithstanding the passage of over three (3) years, combined with the absence of the original photopack shown to Ms. Maldanado, there is only so much that any attorney could have argued on any defendant's behalf. Counsel's closing argument made sense in light of the evidence presented at trial and was a "reasonable" trial strategy.

A close analysis of [counsel's] argument shows that she did not concede that it was Mr. Ferrell who may have actually committed a battery.

. . . .

The Court concludes that, given the charge, the actual evidence, and analysis of the structure of the closing arguments of the parties, Counsel's strategy and her actual verbal presentation was not wholly unreasonable nor did it clearly fall outside the range of competence. The Court finds that Counsel's performance was not deficient under *Strickland*.

Ferrell's disagreement with counsel's tactics or strategy will not support a

claim of ineffective assistance of counsel.  Counsel gave a lengthy closing argument

in which she repeatedly asserted both that Ferrell did not fit the physical description

provided by the witnesses and that the state failed to prove its case beyond a

reasonable doubt. (Respondent's Exhibit 1, Vol. VIII, pp. 365–76, 398–412)

Counsel's argument that the state "could have possibly proven" the crime of battery

is not a concession of Ferrell's guilt of either the charged offense or a lesser-included

offense. Ferrell does not overcome the presumption both that the challenged conduct

of counsel was a matter of strategy and that the strategy was objectively reasonable.

*Strickland*, 466 U.S. at 689. Ferrell also fails to meet his burden of proving that the

state court unreasonably applied *Strickland* or unreasonably determined the facts by

rejecting this ground.[14] 28 U.S.C. § 2254(d)(1), (2).

---

[14] Even assuming that counsel conceded without Ferrell's consent his guilt of the lesser-included offense of battery, Ferrell is not entitled to relief. Counsel was not precluded from pursuing a strategy of admitting Ferrell's guilt to a lesser-included offense despite Ferrell's disagreement with that strategy. *Florida v. Nixon*, 543 U.S. 175, 187 (2004), explains:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417–418, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n.1, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

The United States Supreme Court has not extended *Nixon* to require counsel to consult with a defendant before conceding guilt of a lesser-included offense. *See Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1250 (11th Cir. 2011) ("*Nixon*'s explicit consent to counsel's concession strategy was not required.") (citing *Nixon*, 543 U.S. at 189).

**Ground Twelve**

Ferrell contends that his trial counsel rendered ineffective assistance by "arguing irreconcilable inconsistent defense theories to the jury in closing argument." (Doc. 1, p. 25)  Specifically, Ferrell alleges that counsel improperly argued that the state failed to present the metal rod for the jury to determine whether the rod was a "deadly weapon" while simultaneously asserting that Ferrell did not commit the crime.

The state post-conviction court denied this ground after an evidentiary hearing (Respondent's Exhibit 6, Vol. I, final order denying the amended Rule 3.850 and motion for rehearing, pp. 196–202) (court's record citations):

> Allegations
>
> Mr. Ferrell alleges that Counsel argued inconsistent defense theories during closing argument. He contends Counsel outright argued that he was guilty of the crime of battery while simultaneously arguing that he was not the person who committed the instant crime. She argued that the State had failed to prove the "with deadly weapon" portion of the charged crime because the State did not introduce the purported deadly weapon into evidence. Counsel should have known that this argument was legally deficient because of the trial court ruling . . . that the State only had to prove evidence of great bodily harm and that the jury believe Mr. Ferrell was the perpetrator in order to convict the Defendant. . . . He was prejudiced by Counsel's inconsistent arguments in the initial closing argument as shown by the prosecutor's response that he "couldn't figure out the defense" because Counsel first argued "it wasn't an aggravated battery, just a battery and the Defendant did it" and then Counsel argued that Mr. Ferrell was not involved at all. Counsel repeated the inconsistent defense theories in the second part of her closing argument. Also, Counsel failed to object to the prosecutor arguing that Counsel had argued a self-defense theory when Counsel had never argued a self-defense theory. Any reasonable juror would have been inclined to believe that Mr. Ferrell was guilty because Counsel practically conceded his

guilt and failed to refute evidence of the victim's injuries. Her argument totally discredited the defense. Had Counsel argued a single defense of misidentification, there is a reasonable probability that the outcome of the trial would have been different.

[Rule 3.850] Evidentiary Hearing

Counsel testified that she argued that the descriptions provided by [the victim] and Ms. Maldanado to Officer Paz did not match Mr. Ferrell. She filed a motion to exclude testimony about Ms. Maldanado's pretrial identification of Mr. Ferrell from the photopack because the State had lost the original photopack, but the trial court denied her motion. Counsel did not think this mattered: "And I don't think it would have mattered anyway because [Maldanado] was very clear that she would never forget his face." [The victim] and Ms. Maldonado gave Officer Paz "a description of a dark-skinned black male, black/Hispanic male, or a dark-skinned male, whatever dark-skinned means to him."

Counsel reviewed Officer Paz's deposition prior to trial. Misidentification was a big issue at trial which is why she focused on the description Officer Paz received and then asked him if Mr. Ferrell fit that description. Counsel "only argued the lesser included because there was no weapon for the jury to evaluate for themselves to determine if it was truly a deadly weapon." Defense attorneys quite often argue "lesser includeds" to "take away the bigger crime out of the jury's consideration."

Counsel did not think that she had argued that Mr. Ferrell was guilty of battery. She intentionally focused the second part of her argument on the fact that Mr. Ferrell was not even there. This was why "most of [her questions on cross-examination] at trial were — you know — were geared towards this dark-skinned black person or dark-skinned male or Hispanic or whatever."

Counsel filed a motion *in limine* to exclude testimony about the photopack because, by the time of Detective Rockhill's deposition in February 1999, the State no longer had the original photopack and Counsel wanted to exclude testimony about Ms. Maldanado's identification of Mr. Ferrell from the photopack at trial. The trial court denied Counsel's motion and allowed Detective Rockhill to testify at trial that Ms.

Maldanado had identified Mr. Ferrell from a photopack. Mr. Ferrell testified that his defense theory was mistaken identification with an alibi and that he had pled not guilty to the crime charged and to any lesser offense. Counsel did not discuss that she planned to argue anything that would practically concede he had committed a lesser offense with him prior to making the argument. He believed Counsel "argued outright to the jury" that the State had failed to prove a crime was committed and "then failed to prove he was the one" [while] at the same time . . . "telling the jury that . . . I committed a battery." Counsel should only have argued the misidentification defense.

. . . .

Court Analysis

. . . .

The Court analyzed Counsel's initial and rebuttal closing arguments in depth . . . and concluded that Counsel had not, in fact, argued to the jury that Mr. Ferrell committed the crime of battery. Counsel testified that a common defense strategy was to argue "lesser includeds" to minimize the maximum exposure faced by defendants. Her comments were carefully worded and she rebutted the prosecutor's argument that it was hard to figure out the defense. Moreover, Mr. Ferrell repeated the very themes Counsel made in closing argument and complained about the advocacy by the prosecutor to the trial court after the jury retired for deliberations.

The Court disagrees with Mr. Ferrell's allegation that Counsel did not respond to the prosecutor's argument that the defense had presented self-defense. . . .

The Court also comments on Mr. Ferrell's allegation that Counsel did not refute the victim injury evidence of the State. Counsel did not attempt to refute the very limited testimony about the victim's injuries. The Court finds that she probably could not have done so based on several facts. First, [the victim] testified in his deposition at length about his multiple health problems following the incident and testified at trial that he was bleeding from his head. Ms. Maldanado and Officer Paz each testified at trial that [the victim] was bleeding from his head at the crime scene. No evidence was presented at the evidentiary hearing to dispute these assertions. Had Counsel attempted to

"refute" this evidence, medical records from Tampa General Hospital and EMS would probably have shown far more serious injuries than bleeding from his head. Counsel sought to limit testimony about the victim's injuries at trial and was successful in doing so.

The Court finds Counsel's testimony at the evidentiary hearing is consistent with what she, in fact, argued at trial and with her deposition testimony that "the State didn't prove that an aggravated battery had occurred" and they "didn't prove her client was involved."

The Court finds that Mr. Ferrell has failed to prove the deficient performance component of *Strickland*.

Counsel pursued a misidentification defense at trial. Counsel's alternative assertion in her closing argument — that even if an aggravated battery occurred, the state failed to produce sufficient evidence to prove that Ferrell committed the crime — is not an "irreconcilably inconsistent" defense as Ferrell alleges. He fails to establish "that no objectively competent lawyer would have taken the action that his lawyer did take." *Van Poyck*, 290 F.3d at 1322. Ferrell fails to meet his burden of proving that the state court unreasonably applied *Strickland* or unreasonably determined the facts by rejecting ground twelve. 28 U.S.C. § 2254(d)(1), (2).

Accordingly, Ferrell's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Ferrell and close this action.

## DENIAL OF BOTH A
## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Ferrell is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue

a COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  To merit a COA, Ferrell must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).  Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Ferrell is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Ferrell must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on September 30, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE